If the court please, my name is Myers Morton. I'm from Knoxville. I have hearing loss and I have some new hearing aids. And as a result, I don't know how loud I'm speaking sometimes. So if I speak too loud, I've asked for seven minutes of rebuttal. John Quillen, the president of Southern Forest Watch is here this morning. I think I'm supposed to point him out to you, if the court please. The Smoky Mountains National Park was created in 1926. It was fully constituted and open for business in 1934. There are approximately a hundred undeveloped backcountry campsites that people use. There's nothing there. It's the ground. There are bear cables where you hang your packs to keep the bears from getting your packs and firing. The bear cables were not put there by the National Park. They were put there with money raised from friends of the Great Smoky Mountains. In other words, these backcountry campsites have no amenities. You sleep on the ground. Boy Scouts, Girl Scouts, families that have relatives buried there, they stay there. For 80 years approximately, it's been free. Nothing was provided. Nothing was paid for. Congress passed a law called FLORIA 16 U.S.C. 6801 that gives the National Park Service the power to charge for using things. And in that statute 6803 that's titled public participation, FLORIA specifically says the National Park Service is required to have public participation in any decisions to implement a new fee. That 6803 additionally requires in a new fee area that the National Park Service create regulations and guidelines on those public participation, how they're supposed to participate publicly. There's a question, and this is on We lost on summary judgment. By this record, the court can conclude this is a new fee area. Well, but new fee area is a statutory term. Tell me if I'm speaking that enough. So it's a statutory term. It's not defined, but it's been interpreted, and the interpretation is that you look at the area, and the area is the park. And if you've previously charged fees in the park, then it's not a new fee area, it's a new fee. That's correct, Your Honor. And where is your authority to the contrary? Well, first of all, if the court please, that authority that you just described is in Appendix L. Appendix L are the guidelines that the National Park Service adopted pursuant to FLORIA on how you participate. And so on the one hand, the National Park Service is saying... Is it in the wrong document? Is that your point? They're relying on Appendix L here, but over here they're saying they don't have to. But let me ask you a question. I'm sorry. There's a new fee, and there's a new fee area, and they're two different things. And there are certain requirements for both. I mean, they both have their requirements, but there are additional requirements for a new fee area. Now, the first question is, is it a new fee area? And you're saying that it is, and what is that based on, or how do you undermine their definition of new fee area? I'm sorry to answer your question the first time. This is the first fee passed under FLORIA. There's been no other fee passed under the authority of FLORIA. Every single other fee ever charged by the Great Smoky Mountains National Park has been for a pavilion, for a campground, car camping, where amenities are provided. That is my sole source of authority for my argument. This is a new fee area. There's never been a FLORIA fee passed ever before. Is it because it's the first one after the statute was passed? Yes, Your Honor. Okay, so then it's a matter of statutory interpretation whether new means new under the statute or new didn't exist before, right? So that would be an issue that should be decided on summary judgment, I would think. That's correct, Your Honor, but the guidelines themselves specifically say it does apply. It says the public engagement guidelines specifically apply to new fees. It doesn't say new fee area. No, I agree with that. Okay, so then you get to the public engagement sufficiency. They didn't do it. The background information includes a resolution from Knox County saying we oppose this. From Swain County, North Carolina, saying we oppose this. Right, but those all came after the fact. There's only one that made a contemporaneous objection. Is that correct or not? Swain County had some commissioners from North Carolina that made written objections. Yes, Your Honor, that's it. Okay. And as far as, yes, you're correct, they're not contemporaneous, but it is evidence as background information. It's proof that the National Park Service did not contact local officials. But those people, you have affidavits from individuals who say nobody contacted me. He's commissioner for Blount County, yes, Your Honor. Right, but do you think you have to contact each commissioner separately or do you send notice to the commission or the commission's agent or whatever and say this is what we're doing and then you wait to see if they respond? The guidelines say local officials and local, they're a deliberative body. They meet. They make decisions. They hear things. That's where you go. You go to the body. But the statute doesn't say if you send out the notice and people don't like it, you have to go by what people want. That's correct, Your Honor. However, under these guidelines, it says, I'm paraphrasing, I don't have the quote in front of me, but it says, actually, these guidelines say changes, first of all, changes cannot be implemented if civic engagement has not occurred. Well, civic engagement can occur and the civic engagement can come back saying we don't like this and it's still civic engagement and they don't have to do what the response is. I mean, you don't decide this thing by taking a poll is what I'm trying to say. Yes, Your Honor, but with the civic engagement, if they'd done it, the record would include their objections and this court would know that. But it did include the one that responded. It's emails, not from the body itself, not from Swain County Commission, from two commissioners on the commission. If I remember correctly, the Swain County Commission passed a resolution against it a year later. A year later. Nobody, they didn't, nobody, the Park Service did not approach Swain County Commission and say, the guidelines say you have to provide information and give them an ability to respond. They didn't do that. The two commissioners found out about it and said don't do it and sent it in, but they ignored, they bypassed this deliberative body of the county commission all around the park. They didn't do it. First of all, the guidelines say they do and second of all, I contend and assert respectfully that FLORIA requires public participation. 6803 is titled to public participation. And the Park Service knew good and well there was objection to this and there were reasons not to do it and they avoided contacting the people that would object to it for the very reason we're standing here today. They didn't want it in the record.  Yes, Your Honor, seven minutes. Now's the time. Thank you. Thank you. Good morning. May it please the court, my name is Robert Stockman, here on behalf of the National Park Service. We ask this court to affirm the District Court's very thorough and well-reasoned opinion. Before diving into the details of plaintiff's actual challenges, I'd like to emphasize that in the Park's view, this fee has allowed us to provide much better services to the public in the back country. This is only a $4 fee, but under the old system, Park Service was repeatedly receiving complaints both orally and via electronic email about the difficulty of making reservations and also about lots of rule violations in the back country. Additionally, the system they used for recording reservations was going to be outdated and had to be replaced. And with this $4 fee, we've been able to create a 24-7 online reservation system. The system is highly convenient. It provides people with maps of each campsite location as well as information about those sites and informs them about the rules for camping in the back country. And it allows the Park Service to provide people with immediate updates about various hazards like bear activity, inclement weather. So it adds a safety benefit. It's also allowed the Park Service to increase trip planning assistance in the back country and to hire two back country rangers. We're talking about process, so let's talk about process. Sure. Did you establish in the record that you contacted the county commissioners? Yes, the record does establish this, and I'd like to point to a few places.  Not the resolution because it was passed later, but there's a letter from Swain County and also a letter from one individual commissioner, and those are administrative record sites 644, which is page ID 1013, and 271, page ID 640. What about the other ones? So here what we have is the internal notes of the process, and there's three sets of pages identified initially. AR record 555 through 557, which is page IDs 424 to 26, that set out the plan, which was to contact all these various officials. And then you have two administrative record sites, 185 and 243, which are page IDs 554 and 612. And in those we find the notes from this internal process, and you have a quote from one of them, I'm quoting now, from page ID 554. Notified congressional delegation, state and local officials, park partners, and COA holders via briefing paper, distribution, and phone calls, period. One of seven county commissioners against backcountry fees in general, period. So here their commissioners are clearly encompassed within local officials, and they say, we called these people, and we got back one negative result, which is exactly what happened. And then at the next page, you once again have them summarizing. They say, we sent out, we distributed our briefing paper widely to state and local elected representative and government officials. Phone calls were made to local officials. And once again, it summarizes the reports and says, we got one negative report, and that was from Swain County. So this all shows that there was an effort to reach out to the counties. And the question is, can they overcome the presumption of regularity? I mean, here that does apply. So should they be able to? That would be enough if it weren't challenged. Should they be able to actually try to depose somebody and find out if they're right, or should they be able to come back with affidavits from the whole county commission that we have absolutely no record of any communication, and therefore we did not vote, we did not communicate, because we heard nothing. I don't think they should be allowed to in this case, because they didn't raise any objection at the motion for summary judgment stage that they needed the ability to collect more affidavits from other people. And I don't think you get to depose. Didn't they ask for discovery? They asked for discovery of government officials. So I guess there's two categories you're asking about. The first is, can they depose government officials? And that is a very heavy burden. You don't get to do that just because you assert there may be some irregularity. The second question is, could they have tried to affirmatively prove they weren't contacted by, for example, say the counties suing? Notably, none of the plaintiffs here say they didn't know about this. They all had notice, because there was a lot of public notice. And second, the counties themselves aren't suing. But let's say they went and they brought in affidavits from every single county commissioner and lots of evidence. That would present a very different question. Maybe that would finally hit the clear and convincing evidence you might need to overcome the presumption of irregularity. But all they have here is one person saying that he wasn't called. And then he says, as far as he knows, his fellow commissioners weren't called. But he didn't do any investigation. He didn't make any effort that we know of from what they submitted to actually find out if they were called. And then we go on, and he also then says, well, the superintendent admitted to me that he didn't call me. But, of course, there's a lot of people who work for the Park Service, and a lot of the outreach was other people. So even if we assume everything in Brooke Halter's affidavit is true and he remembers everything correctly, it just doesn't come close to showing that the county wasn't contacted. And I also would note the later resolutions. They all have very similar language. It looks like people went and asked people to move for this, which is fine. But one thing none of those resolutions claim is that the counties weren't contacted. And none of those resolutions claim that the state government wasn't contacted. So you have no evidence. They provided no evidence that really shows they weren't contacted. And here you have government records that show the intent was to contact them, that record the contacts were made. And that's just not enough to show the kind of bad faith you need. But what if what this means is, yeah, we contacted local officials. I mean, we called this guy here, that guy there, and that guy there. We contacted three local officials. Well, first, the record itself says they contacted local officials and then says one of seven county commissioners, which suggests that they contacted county commissioners. I mean, I think that's the natural reading. The other thing I'd say is that here the Park Service set up and engaged in an incredibly aggressive public outreach. It was published in multiple newspapers. They did multiple media interviews. It was in the television. It was on the radio. They had two public open houses. They accepted comments via email, regular mail. They did everything the statute requires. The statute only requires that they shall publish notice in local newspapers and publications and then shall provide the public with opportunities to participate in the development. And this record shows there was a huge outreach to try to get the public to participate. And they undoubtedly met their statutory obligations. So their conduct wasn't arbitrary and capricious, even if a mistake were made, which we don't think it was. I mean, we think the record shows they contacted the county commissioners. But even if there weren't, they met their statutory obligations. And the internal guideline, they take it very seriously. And manuals are very helpful. The government wants to do as good a job as it can. We want to reach out to everyone possible. But it's well established under the precedent that this kind of internal manual isn't binding on the agency and for exactly this reason, which is it would really discourage agencies from developing detailed manuals that set higher goals than they have to actually meet under the law. And that was what the Supreme Court said in Schweiker. That's what this court said in Reich v. Magnanus and Valen. And that's what both other circuits to consider the Park Service's internal guidelines and regulations have found. That was in River Runners in the 9th and the Wilderness Society, which is that these aren't binding on the agency in that sort of way. So one, the Park Service doesn't have a legally binding obligation to contact them all. Second, the record shows they did. And I just think it bears emphasis that the record's filled with tons of contacts from lots of other people as well. What seems to emerge here is just that there wasn't so much interest by the county officials, at least not at the time. I also think it's obvious that the public's participation did affect the fee. The Park selected the fee structure that had the most support of all the fee structures. It was the $4 fee structure. They also made adjustments. Does the record include evidence of the dissatisfaction that maybe prompted the Park Service to get interested in charging a fee? That's in there. Oh, it contains. And I think we document this at length in our brief. I won't give you each site. But one, there's the dissatisfaction ahead of time. But second, reading through the comments that came in, the dissatisfaction is palpable. People complaining about how hard it was to make a reservation. Some people never got to make reservations at all. But also, people chopping down woods in the forest because they aren't following the rules. People messing up campsites. Campsites being overcrowded. And I think it's easy to think a reservation may not be a big deal to everyone, but some people really like to know they will have a place they can sleep. And they will have the right to say to someone else, you know, I have a reservation. You can't kick me out of here. I mean, it's a valuable good for a lot of people. So I think the agency met its statutory obligations. The one other thing that has come up at argument is I think there's kind of two statutory arguments that weren't really presented in the briefs. One is whether this is an amenity fee. It is. And second, whether this is a new recreation fee area. And in our view, they forfeited that issue  In their opening brief, in the argument, it drops a footnote that says may therefore be a new fair area. But second, our interpretation is reasonable. Area is an ambiguous term. In the context of national parks, it makes a lot of sense for it to be a park. And if you look at the legislative history, which we cite on page three of our brief, has the report for the FLREA. It shows that area is at least in many ways the equivalent of park. I mean, park would be listed and then lots of other types of administrative units and then area. So the interpretation is reasonable. And there's nothing in the act that suggests that new recreation fee area means the first time you institute a new fee under FLREA. That's how they're kind of suggesting it should be read. The only consequence of this, though, is that it's okay that you didn't publish in the register, right? That's the only consequence. And I'd also note that even assuming we'd had to do so, and I don't think we did, I think there'd be a harmless error argument that's pretty resilient because the whole point of federal register notice is to provide notice. And this was really well known. There were a lot of efforts, a lot of public outreach through the press, through the media, and online. And you got a lot of reaction, too. We got a lot of reaction, especially considering it's a $4 fee. I mean, it's not a force plan, for example. This is a relatively minor change. So for all those reasons, the agency met its obligations. We think the fee is really important to doing a good job, and we think it's been very successful. For all those reasons, we asked the court to affirm, but if the court has any specific questions, I'd be happy to answer them now. Certainly not. Thank you very much. It's only a $4 fee. But next year, there's going to be a zero added to it. $4, a Girl Scout troop has eight girls. That's $32. They must go for two nights. That's $64. That's prohibitive. Well, actually, the fee looks rather modest in terms of what they're charging in other national parks. I understand there's been no fee for the Snooki Mountain National Park, so people get a little excited when the possibility of a fee arises. But folks in other parks have been paying those fees forever, and the parks are still being used. If it does nothing but make the reservation system better, everybody should be happy. Well, first of all, I think those other parks provide something with that fee. And as far as the reservation system, council went outside the record, which is fine, saying that it's a better service. It doesn't work. There was not one. It's not in the record. I don't know how far I can go with this, but there was not one backcountry camper last night in the Great Smoky Mountains National Park, other than in the shelters, based on this reservation system. But I don't want to go beyond the record because that's what the focus is. You went just about as far as your friend at the other table, so that's fine. Now we'll stop. How's that? Your Honor, my brief outlines how the National Park Service made misrepresentations to the public to sell this fee. They lied, cheated, and stole what they did, honestly, Your Honor. They said that the previous reservation system didn't work. Well, first of all, you didn't have to get reservations for 80% of the sites, 20% of the sites. You had to make a reservation by phone call, and it worked. They said that the fee would cover backcountry rangers to go monitor. It didn't. Their authority had nothing to do with backcountry rangers. They adopted a fee that would only fund the reservation system. They knew that. They misrepresented to the public why they needed this fee on the front end. He brought it up. But the main thing is, if the Court please. Remind me what remedy you seek. Make them follow the law. How would we do that? Remand it back and tell them to provide proper public participation. Right. It's a remand for compliance. Compliance with the law. The law says that they have to let the public participate in the adoption of this fee. It is prejudicial error because they're making people pay to go sleep on the ground. Well, this particular volume of the thing that I have is a lot of public participation. I don't know how many, a couple of hundred emails. And it looks like most of them are in opposition to the fee. They're petitions with, I would say, hundreds of names on them. That's public participation. But it doesn't mean they have to do what the vote is by the people who are publicly participating. They can ignore emails. They can't ignore political people that are in charge of the local area. They have to listen to them. They don't have to listen. They can listen to them, but it doesn't mean they have to do what those people want them to do. We don't know what the National Park Service would have done had they contacted the local county deliberative bodies who would oppose this. They may not have done this if they'd have followed the public participation requirements. This is on summary judgment, too. It was dismissed on summary judgment. And the council talked about the presumption. I think he said irregularity. If he did, it was a Freudian slip. But the presumption of irregularity doesn't apply if there's some evidence that they didn't do what they're supposed to do. And the superintendent of the Great Smoky Mountains National Park said he did not contact Blount County officials. He said that to Mr. Burkholder. That's in this record. Is that enough to remand it right there? Yes, Your Honor. Why? In view of the evidence, the counter evidence of compliance. There is no evidence in the record. Not with regard to Blount County, right? That's correct. But if you miss one county for who knows what reason, and you missed calling them, because I understand it was on TV, it was on the radio, there are all these other efforts. Should we discount those? No, but the law says, appendix L says, contact local and state officials. Does it say every? Well, there's seven. You would say that it says every. And when you miss Blount County? They missed Swain County. There's only seven counties within which the park lies. And plus, don't forget, we've got a resolution from the speaker of the Tennessee House of Representatives saying they're against this. They didn't contact the state officials either, like appendix L says they're required to. And plus... Are you saying that they didn't notify state officials? By this record, they did not. The speaker of the state House of Representatives, in the record, this is one of those background documents that say we would have... I'm paraphrasing. I don't have the resolution, but they oppose this backpacker tax, or my word, Your Honor, I'm sorry, they oppose this fee unless the Park Service provides some amenities. That's what the state said. And so, on summary judgment, this court, or the trial court, should presume that the state, based on that, that the state was never contacted. If the court please. And I refer to, as far as the presumption of regularity, the Meister case of this court, the counsel talked about their reasonable interpretation. I don't think that they're entitled to any presumption of regularity based on this affidavit from Mr. Burkhalter and based upon what... I think you've covered that presumption for us. I appreciate it. I appreciate arguments from both sides. As before, we will consider this case carefully and issue an opinion. Thank you. Thank you very much.